**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

OLIVER BIEWALD, an individual,

PLAINTIFF,

v.

SEP SOFTWARE CORPORATION SYSTEMS, INC., d/b/a SEP SOFTWARE
CORPORATION, a Delaware for-profit corporation; SEP AG, a German for-profit corporation;
and TIMOTHY ALAN WAGNER, an individual,

DEFENDANTS.

---

## COMPLAINT

---

Plaintiff, OLIVER BIEWALD ("Plaintiff" or "Mr. Biewald"), by and through his

undersigned counsel at the law offices of Bryan E. Kuhn, Counselor at Law, P.C., hereby

submits his Verified Complaint against Defendants, SEP SOFTWARE CORPORATION

SYSTEMS, INC., d/b/a SEP SOFTWARE CORPORATION ("Defendant SEP Corp."), a

Delaware for-profit corporation; SEP AG ("Defendant SEP AG"), a German for-profit

corporation; and, TIMOTHY ALAN WAGNER ("Defendant Wagner"), an individual, alleging

as follows:

### INTRODUCTION

1.    This is an employment suit brought by a former employee employed by Defendant

SEP Corp. and Defendant SEP AG subject to a written agreement. The Defendants failed to

properly pay Plaintiff's earned wages in violation of state and federal law. After Plaintiff complained about the inappropriate actions of his employer, he was told he was a "contractor" rather than an employee, not properly paid, terminated, and replaced with an employee who had not engaged in protected activity. Following the termination, the corporate Defendants failed to comply with their contractual obligations. Plaintiff asserts claims of violations of the Colorado Wage Claim Act ("CWCA") Colo. Rev. Stat. § 8-4-109, *et seq,* breach of contract, unjust enrichment, conversion, *promissory estoppel*, violations of the Fair Labor Standards Act 29 U.S.C. § 201, *et seq.*, violations of the Colorado Minimum Wage Order ("Wage Order") Colo. Rev. Stat. §§ 8-6-101, *et seq*., and, wrongful termination in violation of public policy.

## JURISDICTION

2.      This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332(c)(1), because there is complete diversity amongst the parties, and the amount in controversy exceeds $75,000.00.

3.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

4.      In addition, this Court has jurisdiction over Defendant SEP Corp. as the unlawful employment practices took place in Colorado and Defendant SEP Corp. maintains substantial, ongoing business operation(s) in this state.

5.      This Court has jurisdiction over Defendant SEP AG as the unlawful employment practices took place in Colorado and the Defendant maintains substantial, ongoing business communication(s) in this state.

6.     This Court has jurisdiction over Defendant Wagner as he is a resident of Colorado and resides in Boulder County.

## VENUE

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful were committed in the District of Colorado.

8.     The Parties have contractually agreed that Colorado state law will apply.

## PARTIES

9.     Mr. Biewald is a resident of Center Barnstead, New Hampshire, 03225.

10.     Defendant SEP Corp. is a Delaware corporation, doing business as a foreign for-profit corporation in Colorado at 1630 30th Street, Ste. A #265, Boulder, Colorado 80301, and a registered agent located at 94 Benthaven Place, Boulder, Colorado 80305.

11.     Defendant SEP AG is a corporation organized and existing under the laws of Germany with its principal place of business at Konrad-Zuse-Strasse 5, 83607 Holzkirchen, Germany.

12.     Defendant Wagner is an individual, who resides at 94 Benthaven Place, Boulder, Colorado 80305.

13.     At all times pertinent to this Complaint, the corporate Defendants were enterprises engaged in interstate commerce or in the production of goods for consumers as defined § 3(r) and 3(s) of the Act, 29 U.S.C §§ 203(1) and 203(s).

14.     The annual gross sales volume of each corporate Defendant was in excess of $500,000.00 per annum.

15.    Defendant Wagner is President of Defendant SEP Corp. and acted directly and indirectly in the interests of Defendant SEP Corp. in relation to Mr. Biewald by setting his rate of pay, the method of compensation, and by acting as his direct supervisor.

16.    At all relevant times, Plaintiff was an "employee", as set forth in 29 U.S.C. § 203(e)(1) of the FLSA and in Colo. Rev. Stat. § 8-4-101(4) of the CWCA.

17.    At all relevant times, Defendant SEP Corp. and Defendant SEP AG were covered by the definitions of "employer" set forth in Colo. Rev. Stat. § 8-4-101(5) of the CWCA.

18.    At all relevant times, all Defendants were covered by the definitions of "employer" set forth in 29 U.S.C. § 203(d) and 203(g) of the FLSA.

## FACTUAL ALLEGATIONS

**Mr. Biewald Began Employment Subject to An Employment Agreement:**

19.    On June 8, 2015, Mr. Biewald, Defendant SEP Corp. and Defendant SEP AG signed an Employment Agreement ("Agreement") setting out the rights, terms, and obligations of Plaintiff's employment and any separation therefrom. *See*, a true and accurate copy of the Employment Agreement attached hereto as Exhibit No. 1.

20.    Therein, "Company" was defined as Defendant SEP Corp. and "its owners and/or parents (*including* [Defendant SEP AG] Zieglestrasse 1, 83629 Weyarn, Germany) its subsidiaries, successors, and assigns." *See*, Exhibit No. 1 (*emphasis added).*

21.    The Agreement was initialed and signed by Defendant Wagner on behalf of Defendant SEP Corp. and Mr. Georg Moosreiner (Chairman of the Board of Defendant SEP Corp. and CEO of Defendant SEP AG) ("Mr. Moosreiner") on behalf of Defendant SEP AG. *See*, Exhibit No. 1.

22.     The Parties agreed that the Agreement could not be modified, waived, or discharged unless the modification, waiver, or discharge was agreed to in writing and signed by Mr. Biewald and an authorized officer of the corporate Defendants. *See,* Exhibit No. 1, Section 7b.

23.     The Parties agreed that the validity, interpretation, construction, and performance of the Agreement would be governed by the laws of the State of Colorado. *See,* Exhibit No. 1, Section 7(e).

24.     Mr. Biewald's position with the Company was Vice President, Channels and Alliances. *See,* Exhibit No. 1, Section 1(a).

25.     The corporate Defendants agreed to employ Mr. Biewald for an average of thirty (30) hours per week. *See,* Exhibit No. 1, Section 1(a).

26.     Mr. Biewald worked primarily out of his home in Center Barnstead, New Hampshire and was authorized by the Agreement to perform his responsibilities in any geographical location. *See,* Exhibit No. 1, Section 1(e).

27.     Defendant SEP Corp. and Defendant SEP AG agreed to pay Mr. Biewald a base salary of $120,000.00 per year, based on a thirty (30) hour work week. *See,* Exhibit No. 1, Section 2(a).

**The Agreement Contemplated the Payment of Commissions:**

28.     The corporate Defendants agreed to pay Mr. Biewald a commission of thirty percent (30%) of the purchase order or order value of any "Sale." *See,* Exhibit No. 1, Section 2(b).

29.     The Agreement specifically acknowledged that there would be considerable up-front recruiting work, management, conceptual selling, and business development required to

convince Channel Partners to promote or recommend Company Products internally and to their own external customers. *See,* Exhibit No. 1, Section 2(b).

30.    "Sale" was defined in the Agreement as "any transfer of software, licenses, royalties, maintenance, maintenance renewal, training, support, services, or any other products or services ("Company Products") to or through any resellers, distributors, integrators, consultants, independent software vendors (ISVs), hardware vendors, technology partners, and OEMs ("Channel Partners"), even if the Sale occurred with minimal or no Employee involvement (or through another employee's involvement). *See,* Exhibit No. 1, Section 2(b).

31.    The Agreement specifically excluded commission to Mr. Biewald for any Sale to or through any pre-existing Channel Partner listed in Attachment C to the Agreement. *See,* Exhibit No. 1, Section 2(b) and Attachment C.

32.    Commissions were earned upon the earlier of the corporate Defendants' receipt of a Channel Partner's statement of intention to transact business with the company, whether in the form of a request for Company Products, a purchase order, a letter of intent, a communicated/estimated forecast, or an executive-endorsed business plan from a Channel Partner, or, the Company's invoicing for, the Company Products. *See,* Exhibit No. 1, Section 2(b).

33.    Defendant SEP Corp. and Defendant SEP AG agreed to pay commissions to Mr. Biewald within thirty (30) days after receipt of payment for the Sale of Company Products. *See,* Exhibit No. 1, Section 2(b).

**The Agreement Provided Specific Additional Benefits to Plaintiff:**

34.    The corporate Defendants agreed to provide Mr. Biewald with health insurance for him and his spouse, domestic partner, and/or dependents, immediately at the start of employment in June 2015. *See,* Exhibit No. 1, Section 2(c).

35.    Mr. Biewald was entitled to a 401k match of up to five percent (5%), with whole percentages from one percent (1%) to three percent (3%) and one-half percent (0.5%) for four percent (4%) to seven percent (7%). For example, if Mr. Biewald contributed two percent (2%) of his salary, Company would match two percent (2%) of the contribution. if Mr. Biewald contributed six percent (6%) of his salary, the corporate Defendants would match four and half percent (4.5%) of the contribution. *See,* Exhibit No. 1, Section 2(d).

36.    Additionally, Mr. Biewald was entitled to twenty (20) vacation days per year. Any vacation not utilized in the calendar year could carry over to the following year(s) or be paid as daily salary upon written request. *See,* Exhibit No. 1, Section 3.

37.    Mr. Biewald was contractually authorized to incur necessary and reasonable travel, entertainment, and other business expenses in connection with his duties. Similarly, the corporate Defendants agreed to reimburse him within fourteen (14) days for such expenses if Mr. Biewald presented an itemized account and appropriate supporting documentation of the charges incurred. *See,* Exhibit No. 1, Section 4.

38.    Defendant SEP Corp. and Defendant SEP AG agreed to reimburse Mr. Biewald for a phone/fax line in his home office, a cell phone plan with associated voice, text, and data plan, a mobile broadband/hotspot data plan for laptop connectivity while traveling, and the monthly fee for broadband Internet access in his home office. *See,* Exhibit No. 1, Section 4.

**The Parties Agreed on Specific Rights Upon Termination of the Agreement**

39.    The Parties agreed that the Agreement would remain in place until it was terminated by death or Permanent Disability of Mr. Biewald or by either party with thirty (30) days written advance notice. *See,* Exhibit No. 1, Section 5(a)-(b).

40.    Upon termination of the Agreement, Defendant SEP Corp. and Defendant SEP AG agreed to pay salary, commissions, benefits, and reimbursements earned prior to the effective date of the termination. *See,* Exhibit No. 1, Section 5(c).

41.    The corporate Defendants also agreed to pay "Residual Commissions" on all Sales occurring within a six (6) month period after the effective date of the termination, as the Parties agreed those monies were previously earned. *See,* Exhibit No. 1, Section 5(c).

42.    Residual Commissions would be paid to Mr. Biewald within thirty (30) days after the corporate Defendants received payment for the Sale of Company Products. *See,* Exhibit No. 1, Sections 5(c) and 2(b).

43.    The corporate Defendants agreed to reasonably assist Mr. Biewald to audit any accounting in question, including obtaining third-party information from Channel Partners. *See,* Exhibit No. 1, Section 5(c).

44.    Mr. Biewald was also entitled to six (6) months of his then-current salary as severance if he was dismissed for any reason other than malfeasance, misconduct, harassment, or gross negligence. *See,* Exhibit No. 1, Section 5(c).

**Mr. Biewald, Mr. Moosreiner, Defendant Wagner, Defendant SEP Corp. and Defendant SEP AG all Follow Business Practices Consistently in Year 2015, 2016, and 2017**

45.    Mr. Biewald began his employment on June 8, 2015, and subsequently, on June 9, 2015, Mr. Sebastian Moosreiner (the principle shareholder of Defendant SEP AG, the son of Mr. Moosreiner, and the authorized representative for Defendant SEP Corp.) ("Mr. Sebastian Moosreiner") filled out and executed the Form I-9 ("Employment Eligibility Verification") for Mr. Biewald's employment.

46.    Defendant Wagner, Mr. Moosreiner, Mr. Sebastian Moosreiner, and Mr. Biewald worked together to ensure Mr. Biewald was authorized for work and that he was quickly set up on payroll. Mr. Sebastian Moosreiner and Mrs. Susanne Moosreiner (a major shareholder of Defendant SEP AG, the Head of Finance at Defendant SEP AG, the Head of Human Resources at Defendant SEP AG, and the wife of Mr. Sebastian Moosreiner) ("Mrs. Susanne Moosreiner") provided Mr. Biewald with password-protected access to the secure, internal websites of Defendant SEP AG, they ordered (and paid for) business cards for Mr. Biewald, and they issued him a uniform for trade-shows.

47.    Later, Mr. Moosreiner also provided Mr. Biewald with a set of keys to the corporate headquarter building of Defendant SEP AG, so that Mr. Biewald could work alone in the office, late at night.

48.    In an email to Mr. Biewald on June 11, 2015, Defendant Wagner established that Mr. Biewald's pro-rated monthly salary would be calculated as $454.54 per day in order to pay Mr. Biewald his wages from June 8, 2015 to the next scheduled payroll date of June 15, 2015.

49.    From approximately June 9, 2015 through June 19, 2015, both Mr. Moosreiner and Defendant Wagner authorized, arranged for, and assigned Mr. Biewald to travel with- and to be

trained by- Mr. Johann Krahfuss (Head of Sales of Defendant SEP AG). Accordingly, Mr.

Biewald spent more than one (1) week in the corporate training program of Defendant SEP AG.

Mr. Moosreiner, too, assisted in the training program, and, introduced Mr. Biewald as a new

employee to partners of Defendant SEP AG, for example, to Mr. David Hutchison-Bird.

50.    During this time, both corporate Defendants shared in paying for the training costs

(travel, meals, incidentals, etc.).

51.    Defendant Wagner and Mr. Moosreiner assigned Mr. Biewald to many external

events and trade-shows, and accordingly, Mr. Biewald represented both corporate Defendants in

his business activities (including, but not limited to, trade-shows like Red Hat Summit 2015 in

Boston, Oracle OpenWorld 2015 in San Francisco, SUSECon 2015 in Amsterdam, Cloud Expo

2015 in Frankfurt, Data Centre World 2015 in Frankfurt, Micro Focus Open Horizons 2015 in

Frankfurt, Fujitsu Forum 2015 in Munich, and so on).

52.    These activities were in-line with Mr. Biewald's job description and they coincided

with the key responsibilities defined in the Agreement.

53.    Mr. Biewald received general pre-approval from Defendant Wagner and from Mr.

Moosreiner to arrange his own business travel, including making arrangements for registration to

these key, strategic events which were part of the core business activities of both corporate

Defendants and were an integral part of Mr. Biewald's job duties.

54.    Defendant Wagner and Defendant SEP Corp. regularly reimbursed Mr. Biewald for

any associated business and travel expenses, and Defendant SEP AG, at times, covered some of

the incidental costs as well.

55.     Defendant Wagner and Mr. Moosreiner also authorized and assigned Mr. Biewald to take part in many internal corporate events, including those of Defendant SEP AG, like the "Sales Meeting" of Mr. Johann Krahfuss, conducted for one week in Antalya, Turkey during November 2015, and, Mr. Moosreiner's "Year-End Review Meeting" in Schliersee, Germany during December 2015.

56.     The associated business and travel expenses were fully covered by both Defendant SEP Corp. and Defendant SEP AG.

57.     Throughout 2016, Mr. Biewald continued his assigned activities by participating in- and representing both corporate Defendants at- the most significant events and trade-shows which were highly-strategic to the success of the Defendants. For example, in order to conduct his job responsibilities effectively, Mr. Biewald booked travel and event registration for major shows like IBM PartnerWorld 2016 in Orlando, CeBIT 2016 in Hanover, SAP SMB/B1 Summit 2016 in Orlando, Fujitsu World Tour 2016 in Orlando, SAP SAPPHIRE 2016 in Orlando, Red Hat Summit 2016 in San Francisco, IBM Edge 2016 in Las Vegas, SAP TechEd in Las Vegas, SAP ASUG B1 Conference in Miami, SUSECon 2016 in Washington, and so on.

58.     Both corporate Defendants paid for the associated business/travel costs in 2016.

59.     Defendant Wagner and Mr. Moosreiner also continued to make Mr. Biewald's participation mandatory at internal corporate events and critically-important meetings held by Defendant SEP Corp. and Defendant SEP AG. Defendant Wagner, as well, even participated side-by-side with Mr. Biewald at these meetings. For example, Mr. Biewald and Defendant Wagner were called upon to take part in the "SEP-to-the-Top" event in Tegernsee, Germany during February 2016, and both were required, along with Mr. Christian Ruoff (an employee of

Defendant SEP AG, and an officer, director, and shareholder of Defendant SEP Corp.) ("Mr. Ruoff"), to take part in the "SEP USA HQ Planning Meeting" in Boulder, Colorado during February 2016.

60.   The associated business/travel expenses were covered by both Defendant SEP Corp. and Defendant SEP AG.

61.   Throughout Year 2017, Mr. Biewald conducted his job duties in the same manner, by notifying Defendant Wagner and Mr. Moosreiner regularly (for example, on the standard, weekly schedule) about all past and future business activities planned by Mr. Biewald, and subsequently, he then arranged his travel schedule accordingly, attending both internal and external events for the benefit of both corporate Defendants. A few examples of the events which Mr. Biewald successfully participated in during 2017 were: Fujitsu Storage Days 2017 in Mannheim, SUSE Summit 2017 in Munich, IBM PartnerWorld 2017 in Las Vegas, Fujitsu America Pre-Sales Training 2017 in Dallas, Fujitsu World Tour 2017 in Santa Clara, IBM InterConnect 2017 in Las Vegas, SAP SMB/B1 Summit 2017 in Fort Lauderdale, MariaDB M-2017 in New York, Red Hat Summit 2017 in Boston, SAP SAPHIRE 2017 in Orlando, and PostgresVision 2017 in Boston.

62.   Often times, just like in Year 2015 and Year 2016, the marketing-department-personnel from both corporate Defendants, under the direction of Defendant Wagner and Mr. Moosreiner, as well as Mr. Ruoff (and other authorized employees involved with the execution of trade-shows), would all assist as best they could, whenever they could, for example, by sending Mr. Biewald helpful instructions on how to register for shows (using special website codes, pre-purchased tickets, or discounted tickets).

63.    As seen from scheduling calendars, Mr. Biewald was "de-facto" assigned to these annual trade-shows and he was always expected to set up many meetings at these shows (for which he was often the only qualified employee capable of fully covering the detailed subject matter for these big meetings). Year after year, Mr. Biewald was the required "cornerstone attendee" at these major shows, and at times, other employees from both corporate Defendants were assigned to support his leadership.

64.    The travel expenses in 2017 for the shows listed above, and many other meetings conducted in the USA and in Europe, were fully covered by both Defendant SEP Corp. and Defendant SEP AG. As usual, Defendant Wagner was heavily involved in reimbursing Mr. Biewald for the business/travel expenses submitted by Mr. Biewald.

65.    In September 2017, Mr. Biewald covered a major trade-show in Prague called SUSECon 2017 – a trade-show for which he had two (2) prior years of experience in covering via his account management role for his assigned Channel Partner: SUSE.

66.    Similarly, Defendant SEP Corp. and Defendant SEP AG benefitted by having Mr. Biewald handle the dozens of business planning meetings which took place in Prague. Thus, the associated travel expenses related to SUSECon 2017 in Prague, in addition to the costs to attend various internal meetings in Europe with Mr. Moosreiner and Mr. Ruoff were shared and fully covered by both Defendant SEP AG and Defendant SEP Corp. (in the case of Defendant SEP Corp. the expenses were approved for reimbursement by Defendant Wagner).

67.    In October 2017, Defendant Wagner listened intently on the internal weekly status calls with Mr. Biewald and other employees as Mr. Biewald outlined the follow-up meetings that were being planned with one of Mr. Biewald's assigned Channel Partners called Dell EMC.

68.     Defendant Wagner in Boulder, Colorado was invited to dial in by teleconference call in order to participate in an upcoming meeting organized by Mr. Biewald at a Dell EMC headquarter site located in Hopkinton, Massachusetts. The recorded meeting on October 11, 2017 was led by Mr. Biewald, with participation from local Dell EMC decision-makers, as well as Defendant Wagner via teleconference call. Defendant Wagner approved and paid Mr. Biewald's employee-request for business travel reimbursement to visit that Dell EMC site.

69.     Similarly, in November 2017, Defendant Wagner once again participated in yet another follow-up meeting and recorded conference call led by Mr. Biewald for the Dell EMC opportunity. Mr. Biewald's employee travel expenses, incurred on November 8, 2017, were approved and reimbursed to Mr. Biewald by Defendant Wagner and Defendant SEP Corp.

70.     In December 2017, Defendant Wagner listened intently as Mr. Biewald spoke of a "deal closing" with a customer called Federal Mogul, constituting a Sale for Mr. Biewald (since it was transacting through one of Mr. Biewald's assigned Channel Partners, called Fujitsu).

71.     For the benefit of both corporate Defendants, Mr. Biewald met with another Channel Partner (SUSE) in order to highlight the exciting win and to promote the business.

72.     Moreover, Mr. Biewald needed to follow-up on the open action items from the SUSECon 2017 meetings held in Prague. Defendant Wagner was supportive of Mr. Biewald's activities; in fact, Mr. Biewald's employee travel expenses to visit with SUSE in Hudson, Massachusetts, incurred on December 12, 2017, were approved and reimbursed to Mr. Biewald by Defendant Wagner and Defendant SEP Corp.

73.     Between June 2015 and December 2017, Defendant Wagner was notably one hundred percent (100%) consistent in reimbursing Mr. Biewald for his telephone/Internet expenses incurred on a monthly basis in accordance with the Agreement.

74.     Nearly throughout the entirety of Mr. Biewald's employment, Mr. Moosreiner and Defendant Wagner requested Mr. Biewald to access the secure websites of Defendant SEP AG on a weekly basis since Mr. Biewald was asked to post weekly written updates to be shared with all employees globally.

75.     Along these same lines, nearly every single week, from mid-June 2015 through early-March 2018, Mr. Biewald was "conference-call-connected" with Defendant Wagner, Mr. Moosreiner, and many other internal employees globally for an "activity review" meeting. In this manner through weekly-review, both Mr. Moosreiner and Defendant Wagner were at all times made aware of practically all activities (both past and planned) by Mr. Biewald. Accordingly based on their weekly feedback, plus any short-term or long-term projects and activities assigned by them, Mr. Biewald did his job with endorsements from the Defendants.

**Mr. Biewald Requests Payment for Commissions Earned and Was Allegedly Terminated**

76.     Throughout his employment, Plaintiff performed his duties satisfactorily.

77.     The commission rate in the Agreement was subject to revision annually, first on January 1, 2017, with implementation on April 1, 2017. *See,* Exhibit No. 1, Section 5(a).

78.     Throughout 2016, for example, on or about November 17, 2016, Mr. Biewald had escalated his on-going concern to the corporate Defendants and to Defendant Wagner that it was apparent that new leads and possible Sales to Channel Partners (like Encore Technologies) could

be commission-triggering events that should not be inappropriately miscategorized or hidden from Mr. Biewald and thus called for corrective action.

79.     In response, Defendant Wagner followed-up with Mr. Biewald by verifying the tracking problem. Defendant Wagner, after searching his database, then volunteered additional information, stating that the issue indeed needed to be addressed because, he, too, had found multiple examples of business activities with Channel Partners (like Syndesi Solutions) which were not properly reported to Mr. Biewald.

80.     To address any and all mis-categorizations, Mr. Biewald called for a needed "true-up" of all Sales. Defendant Wagner assured Mr. Biewald that he would keep an eye out for mis-categorized Sales.

81.     On or about November 17, 2016, Mr. Biewald also complained to both Defendant Wagner and Mr. Moosreiner that, without any notice, Mr. Biewald's mid-month salary payment of $5,000.00, which was due on November 15, 2016, had not been transacted.

82.     Mr. Biewald pointed out that this was a very serious violation of the terms and conditions of the Agreement (while also noting that it was not the first time that Mr. Biewald was not paid his salary on time). Mr. Biewald requested open communication, an equitable solution, and an immediate remedy.

83.     Furthermore, on or about November 17, 2016, and again, on or about November 22, 2016, Mr. Biewald also called for immediate action to resolve the outstanding amount of unpaid business expenses owed to him, totaling $4,125.97, which were up to over five (5) weeks overdue. Mr. Biewald complained to both Defendant Wagner and Mr. Moosreiner and called

strong attention to the fact that there were repeated violations of the terms and conditions of the

Agreement with Defendant SEP Corp. and Defendant SEP AG.

84.    On or about December 7, 2016, Mr. Biewald repeated and re-escalated his

complaint to Defendant Wagner and Mr. Moosreiner about the late, unpaid business expenses.

85.    Defendant Wagner responded on or about December 8, 2016, asking Mr. Biewald

to speak to Mr. Moosreiner. Furthermore, Defendant Wagner wrote, "We will not be able to pay

you your salary for December. Please discuss your contract with Georg [Mr. Moosreiner]."

86.    As directed by Defendant Wagner, Mr. Biewald followed-up by sending his request

for overdue reimbursements directly to Mr. Moosreiner on or about December 8, 2016, and then

again, on or about December 9, 2016.

87.    On or about December 16, 2016, still without receiving a satisfactory answer from

Defendant Wagner or from Mr. Moosreiner, Mr. Biewald wrote another email to Mr.

Moosreiner, copying Defendant Wagner, requesting an immediate resolution to the business

expenses still outstanding.

88.    Mr. Moosreiner took action and caused Defendant Wagner to quickly bank-transfer

the amounts due to Mr. Biewald.

89.    Mr. Ruoff, who was copied on the escalations, also responded to Mr. Biewald on or

about December 16, 2016, confirming that the business expense reimbursements were taken care

of (as had been promised to Mr. Biewald). Defendant Wagner, too, confirmed.

90.    Shortly thereafter, in order to calm the repeated concerns of Mr. Biewald, Mr.

Moosreiner asked Mr. Biewald to meet him at the Maxlrein Braeustueberl Restaurant for a

"heart-to-heart" lunch. Mr. Moosreiner asked Mr. Biewald to forge ahead in his job despite some "temporary" issues.

91.    Despite these promises, on or about December 27, 2016, Mr. Biewald was forced yet again to complain to Defendant Wagner and Mr. Moosreiner when he did not receive his mid-month salary of $5,000 on December 15, 2016.

92.    Mr. Biewald wrote an email to both Defendant Wagner and Mr. Moosreiner expressing his concern about the missing salary, and he additionally voiced his expectation that he needed to be paid the other $5,000.00 for his wages associated with the latter-half of December 2016. In total, Mr. Biewald was expecting $10,000.00.

93.    Both Defendant Wagner and Mr. Moosreiner responded with apparent concern, but neither of them committed to making the required salary payments to Mr. Biewald during December 2016.

94.    On or about December 29, 2016, Mr. Biewald complained that his missing salary from December 15, 2016, was violating the terms and conditions of the Agreement, and further, the non-payment of his salary was a significant infraction of wage and labor laws.

95.    Mr. Biewald demanded an answer on whether or not he could count on receiving his full $10,000.00 December 2016 salary paid to him on the last day of the month.

96.    Defendant Wagner responded later that same day, confirming Mr. Biewald would immediately be receiving his entire monthly salary of $10,000.00 for the full month of December.

97.     On or about January 30, 2017, Defendant Wagner sent an email to Mr. Biewald suggesting that a new contract/renewal, reduced to a twelve (12) month term, be put in place. The alteration or renegotiation of this specific term, was not a stipulation of the Agreement.

98.     On April 21, 2017, Defendant Wagner forwarded a draft contract renewal to Mr. Biewald with suggested changes from the corporate Defendants, requesting to have a revised contract in place by the end of the April 2017.

99.     The contract was apparently an attempt to drastically change the employment term to approximately eight (8) remaining months to then be terminated on December 31, 2017, and it also attempted to retroactively change the commencement of Mr. Biewald's employment to January 1, 2017, apparently to eliminate the Defendants' contractual obligations to-date, from June 8, 2015 through December 31, 2016 and beyond.

100.    Similarly, the draft included the suggestion that the president of SEP Corp. could sign up Channel Partners without any compensation to Mr. Biewald (a stark conflict to the existing Agreement).

101.    Lastly, the new contract attempted to completely eliminate the $60,000.00 severance package that was a key component of the current Agreement.

102.    On April 25, 2017, Mr. Biewald noted that his business expenses had not been paid properly and that he was missing payment for owed commissions to date. Mr. Biewald requested that those issues be clarified before a new contract was executed.

103.    On June 21, 2017, Mr. Biewald requested the corporate Defendants' revenue report from Channel Partners who were not excluded from his commissions in order to "true-up from the past and move forward with clarity."

104.  Defendant Wagner responded that there were allegedly no new resellers of the product.

105.  Mr. Biewald responded that he was helping every salesperson and engineer within the corporate Defendants to facilitate sales of Company Products, and; therefore, as contractually agreed, he was owed commissions on the business resulting from any Sale to or through any Channel Partner not specifically excluded in Attachment C.

106.  Mr. Biewald requested a consolidated report of Sales to all Channel Partners, stating that the corporate Defendants could strip away the sixty-two (62) Channel Partners listed in Attachment C to determine the amounts of commissions owed to him.

107.  Defendant Wagner refused to provide any information on the Sales.

108.  A little over a month after Mr. Biewald's request for payment of his owed commissions, on July 31, 2017, Defendant Wagner transmitted an email purporting to provide a thirty (30) day notice of termination by Defendant SEP Corp. stating that payment would be provided through August 30, 2017.

109.  Defendant Wagner included Mr. Moosreiner and Mr. Ruoff on the alleged "termination" email but did not mention Defendant SEP AG therein.

110.  Similarly, Defendant Wagner neither mentioned a termination reason of malfeasance, misconduct, harassment, or gross negligence; nor did he mention the business reason(s) for any such termination.

111.  Had the required stipulations of the "Termination" section in the Agreement been properly followed, Mr. Biewald would be contractually entitled to six (6) months of his then-current salary as severance. *See,* Exhibit No. 1, Sections 5(b) and 5(c).

112. Additionally, had the required stipulations of the "Termination" section in the Agreement been followed properly, Mr. Biewald would be entitled to all salary, commissions, residual commissions, benefits, and reimbursements earned prior to the effective date of the alleged termination. *See,* Exhibit No. 1, Sections 5(b) and 5(c).

113. Moreover, Mr. Biewald had twenty-nine (29) earned and unused vacation days accrued at the time of the Defendant Wagner's email, and, had the required stipulations of the "Termination" section in the Agreement been followed properly, Mr. Biewald would be entitled to a payout for the same under the terms of the Agreement.

114. Defendant Wagner did not address or pay Mr. Biewald's final paycheck, any severance monies, earned commissions, residual commissions, or make payments for earned, unused vacation days upon sending the alleged written notice of termination or at the alleged termination date of August 30, 2017.

115. Mr. Biewald was not provided with any official information on State Continuation for his employee health insurance benefits, prior to, nor any time in 2017 following the alleged termination.

116. Similarly, Defendant Wagner failed to comply with the Agreement terms and did not pay Mr. Biewald's submitted expense reports for June, July, or August 2017.

**Mr. Biewald Continued Employment after Defendant Wagner's Email**

117. On August 3, 2017, Mr. Biewald discussed his employment with Mr. Moosreiner and Mr. Ruoff who stated that they wanted him to continue his employment with the corporate Defendants.

118.  On August 10, 2017, Mr. Moosreiner forwarded an email to Mr. Biewald requesting he complete an Application for Delivery of Mail Through Agent for a renewed Regus virtual office set up for the corporate Defendants in Boston, Massachusetts, at Independence Wharf with an address at 470 Atlantic Avenue, 4th Floor, Boston, Massachusetts, 02210. Mr. Biewald completed the application and emailed it to Mr. Moosreiner who signed the same on August 28, 2017, legally authorizing Mr. Biewald as a recipient of the corporate Defendants' company mail.

119.  Mr. Biewald confirmed the discussions about his continued employment via emails to Defendant Wagner, Mr. Moosreiner, and Mr. Ruoff on August 23, 2017, August 30, 2017, September 7, 2017, and, October 9, 2017.

120.  On August 30, 2017, Mr. Moosreiner sent a Skype text message to Mr. Biewald stating that he had directed Defendant Wagner to pay for Mr. Biewald's submitted expense reports and that the corporate Defendants were approaching a viable business plan.

121.  Based on the discussions, Mr. Biewald continued to perform his day-to-day responsibilities for Defendant SEP Corp. and Defendant SEP AG after August 30, 2017.

122.  Neither the corporate Defendants, nor Defendant Wagner, directed Mr. Biewald to discontinue working and all Defendants, with full knowledge that Mr. Biewald was still working, allowed him to do so.

123.  Moreover, Mr. Biewald received his full paycheck through August 31, 2017, and not August 30, 2017, as noted by Defendant Wagner on July 31, 2017.

124.  Additionally, Mr. Biewald's health insurance continued without lapse, his Company email remained active, he retained access to both corporate Defendants' secure computer system(s) and internal website(s), and he was never asked to return any Company property.

Moreover, Mr. Biewald did not receive payment of any of the necessary monies to terminate his Agreement, namely his severance, vacation payout, or residual commissions, and he did not receive his health insurance State Continuation information.

**Mr. Biewald Worked in September 2017 and Was Not Properly Paid**

125.  On September 3, 2017, Mr. Biewald provided Defendant Wagner and Mr. Moosreiner with a written report entailing his work activities between August 27, 2017 and September 2, 2017, and, further outlined the projects he would be working on after taking paid time off on Monday, September 4, 2017, Labor Day, a scheduled company holiday in the United States for SEP Corp.

126.  On September 6, 2017, Defendant Wagner and Mr. Biewald coordinated with each other to pursue an active engagement with a Channel Partner, Pacific Trading Co. Ltd.

127.  On September 7, 2017, Mr. Biewald requested help from Defendant Wagner and Mr. Moosreiner to get his expenses reimbursed from June, July, August, and September.

128.  On September 8, 2017, Mr. Moosreiner requested that Mr. Biewald access the secure systems and records from Defendant SEP Corp. in order to search for background on an Argentinian Gas Company and handle a lead for a Channel Partner, BayNet, through SEP Corp.

129.  On September 9, 2017, Mr. Biewald provided Defendant Wagner and Mr. Moosreiner with a written report entailing his work activities between September 3, 2017 and September 9, 2017, and, Mr. Biewald further outlined the projects he would be working on next.

130.  On September 11, 2017, Defendant Wagner coordinated further with the active Channel Partner, Pacific Trading Co. Ltd., while copying Mr. Biewald in the communication.

131.  On September 11, 2017, Defendant Wagner committed to Mr. Biewald in an internal email that his long-overdue expense reimbursements would be processed that week.

132.  On September 14, 2017, Mr. Moosreiner openly shared with Mr. Biewald an internal email between Mr. Moosreiner and Defendant Wagner in which Mr. Moosreiner had instructed Defendant Wagner to continue to pay Mr. Biewald as had been done up to that point. The email read that as of September 1, 2017, Defendant SEP AG would overtake the costs and Defendant Wagner could deduct these from the license fees owed to Defendant SEP AG.

133.  On September 17, 2017, Mr. Biewald complained to Defendant Wagner in an email, that he had not received the reimbursements of his submitted expenses from June, July, August, and September as had been promised to him on August 30, 2017 by Mr. Moosreiner and once again on September 11, 2017 by Defendant Wagner.

134.  On September 17, 2017, Mr. Biewald provided Defendant Wagner and Mr. Moosreiner with a written report entailing his work activities between September 10, 2017 and September 16, 2017, and, he outlined the projects he would be working on next. During this time, Defendant Wagner was an active participant in various, big projects being led by Mr. Biewald.

135.  On September 18, 2017, Mr. Moosreiner provided Mr. Biewald with a company credit card in order to book hotels and flights for a business trip to Europe in order to represent Defendant SEP Corp. and Defendant SEP AG at a major trade-show, SUSECon 2017, in Prague. Defendant SEP AG, Defendant SEP Corp. and Defendant Wagner covered meals, ground transportation, and incidentals for the two-week trip beginning on September 20, 2017.

136.  On September 20, 2017, Mr. Biewald complained to Mr. Moosreiner in an email, stating that he was still missing $203.56 in reimbursements of expenses and, furthermore, despite the payroll-related instructions that Mr. Moosreiner had sent to Defendant Wagner on September 14, 2017, Mr. Biewald was still missing his salary payment from September 15, 2017.

137.  As such, Mr. Biewald requested a face-to-face dinner meeting with Mr. Moosreiner.

138.  Also, on September 20, 2017, Mr. Biewald sent an email to Defendant Wagner asking him to look into the missing salary which was due on September 15, 2017.  Mr. Biewald wrote that Mr. Moosreiner had assured him one week earlier on September 14, 2017 that his salary would be processed as usual.

139.  Mr. Biewald wrote Defendant Wagner another email on September 20, 2017, asking him to process the expense reimbursement of $203.56 for his monthly Internet and phone services from Verizon for September 2017.

140.  Defendant Wagner emailed Mr. Biewald on September 20, 2017, stating that the Verizon bill was not paid because Mr. Biewald no longer worked for Defendant SEP Corp. once again referencing the alleged termination date of August 30, 2017.

141.  Further, Defendant Wagner stated that he would cancel Plaintiff's health insurance on October 1, 2017, unless Mr. Biewald re-paid Defendant SEP Corp. for $564.77, the amount which had been pre-paid for Mr. Biewald to cover the month of September 2017.

142.  Finally, despite the directive to the contrary from Mr. Moosreiner, Defendant Wagner stated that Mr. Biewald would need to discuss his expenses with Defendant SEP AG.

143.  Defendant Wagner did not discuss payment for Mr. Biewald's contractually owed commissions, severance, detailed health insurance State Continuation information, or vacation payout upon the alleged termination of the Agreement.

144.  On September 21, 2017, Mr. Moosreiner assured Mr. Biewald via a Skype message that he would inquire with Defendant Wagner about the missing mid-month salary.

145.  Later that evening, around 6:45 p.m., Mr. Biewald met with Mr. Moosreiner in Germany and toured the brand-new Defendant SEP AG headquarters. At dinner in the Alte Post restaurant following the tour, Mr. Moosreiner told Mr. Biewald that Defendant Wagner was requiring an additional, formal written agreement between the companies before Defendant SEP Corp. would pay Mr. Biewald his salary for September 2017.

146.  On September 28, 2017, during an in-person meeting in Prague, Mr. Ruoff explained to Mr. Biewald that Defendant Wagner would only consider paying the missing salary for September 2017 if Mr. Biewald would agree to resign from Defendant SEP Corp. "on-the-spot," making his last day of work October 31, 2017, after taking into account the required 30-day advance notice period.

147.  Mr. Ruoff further explained that he had seen some overnight email traffic from Defendant Wagner, indicating that Defendant Wagner was attempting to make the payment of Mr. Biewald's September salary conditional upon some new demands, including Mr. Biewald's resignation.

148.  On September 26, 2017 and September 29, 2017, Mr. Biewald notified Mr. Moosreiner via Skype that he had not been paid his salary for September 2017.

149.  On September 29, 2017, Mr. Moosreiner responded via Skype that he had directed Defendant Wagner to pay the full amount of salary owed that same day and stated that Defendant Wagner responded that he would only pay Mr. Biewald's owed salary for September 2017 if Mr. Biewald agreed to resign his position effective October 30, 2017.

150.  Mr. Moosreiner assured Mr. Biewald via Skype that he had not been de-registered from employment, and Mr. Ruoff, who was sitting with Mr. Biewald when the message was received, provided a confirmation, stating that Mr. Biewald was still employed.

151.  On the evening of September 29, 2017, around 7:00pm, Mr. Biewald met face-to-face with Mr. Moosreiner and Mr. Ruoff at SEP AG headquarters. During the meeting, it was again explained to Mr. Biewald that Defendant Wagner was demanding Mr. Biewald's resignation in order to process the payment for Mr. Biewald's $10,000.00 earned salary for September 2017.

152.  Mr. Biewald responded, indicating that there was no need for him to resign, and that he was protected by Wage and Labor Laws and the Agreement. Further, Mr. Biewald explained how it was improper to withhold his earned salary while making repeated demands for his resignation as a condition for paying his earned wages.

153.  After roughly 30 minutes of discussion, Mr. Moosreiner and Mr. Ruoff agreed with Mr. Biewald. Both men assured Mr. Biewald that they would immediately call Defendant Wagner and demand that he pay Mr. Biewald's full September salary without delay.

**Mr. Biewald Worked in October 2017 and Was Not Properly Paid**

154.  On October 2, 2017, Defendant SEP Corp. paid one half (1/2) of Mr. Biewald's owed salary for September 2017.

155.   That afternoon, Defendant Wagner stated that the payment made was for eleven (11) days of vacation and that Mr. Biewald had two-point-four (2.4) days of vacation remaining, totaling thirteen-point four (13.4) days. This figure was clearly inaccurate based on Mr. Biewald's attendance record.

156.   Defendant Wagner then tried to require Mr. Biewald to resign in order to receive his owed wages, stating "any further arrangements will be undertaken when we are in receipt of your termination agreement with [Defendant SEP Corp.]"

157.   Similarly, Defendant Wagner stated that Defendant SEP Corp. had "no funds to pay" Mr. Biewald until the funds were received from Germany.

158.   Despite this threat, on October 4, 2017, Defendant SEP Corp. paid the remainder of Mr. Biewald's salary for September 2017.

159.   Contradicting his previous message from October 2, 2017 wherein Defendant Wagner referred to the payment as "vacation pay"; now Defendant Wagner referred to the two payments as the "first half of September" and the "final portion of September 2017." Similarly, in the payroll details attached by Defendant Wagner, the two payments were categorized as "regular, semi-monthly" payments.

160.   Along those lines, Defendant Wagner also stated that, to his understanding, Mr. Biewald would be using his vacation days in October 2017, although he claimed only days before that Mr. Biewald had been paid out for the majority of his vacation days.

161.   On October 5, 2017, Mr. Moosreiner provided Mr. Biewald with two (2) template employment contracts.

162.  On October 9, 2017, Mr. Biewald provided Defendant Wagner and Mr. Moosreiner with a summary of the discussion held between Mr. Biewald, Mr. Moosreiner, and Mr. Ruoff on October 4, 2017.  Mr. Biewald stated that he was in agreement with his continuous and uninterrupted employment with the corporate Defendants, still governed by the Agreement, until a new work mode has been finally agreed upon.

163.  Mr. Biewald notified Defendants on October 9, 2017 of his decision to take vacation in October 2017.

164.  On October 13, 2017, Mr. Biewald notified Defendants that he had not received his salary for the first half (1/2) of October 2017.

165.  Mr. Ruoff emailed Mr. Biewald and Mr. Moosreiner on October 16, 2017, requesting that the pair conclude contract negotiations on a new employment contract so that Mr. Biewald could resign from Defendant SEP Corp. by October 23, 2017.

166.  On or about October 17, 2017, Mr. Biewald received payment from Defendant SEP Corp. for his salary for the first half (1/2) of October 2017.

167.  That morning, Mr. Biewald notified the Defendants that his business expenses from August 5, 2017 through October 11, 2017, totaling $1,532.53, had not been paid.

168.  Defendant Wagner responded that the expenses were being held up because Defendant Wagner and the corporate Defendants were "waiting for your new contract."

169.  Mr. Biewald emailed Defendant Wagner, Mr. Moosreiner, and Mr. Ruoff that afternoon restating that his expenses were owed pursuant to the Agreement and were incurred by him in support of the corporate Defendants' company business activities.

170.  On October 17, 2017, Mr. Biewald presented Mr. Moosreiner with "Draft 01" of a new employment contract with Defendant SEP AG, but he received no response.

171.  Similarly, on October 17, 2017, Mr. Biewald restated his request to Defendant Wagner, Mr. Moosreiner, and Mr. Ruoff for his unpaid commissions in writing and requested a consolidated report of all Sales to all Channel Partners, including JCNASSUR for CEDUC.

172.  On October 19, 2017, Defendant Wagner responded that Mr. Biewald had been separated from Defendant SEP Corp. on August 30, 2017, and that continued payments were made to him per an agreement with Mr. Moosreiner and Mr. Ruoff, and, in order to complete his final payment by paying out his vacation hours.

173.  Defendant Wagner refused to provide any sales data, but stated that commissions for sales made to JC Nassur had been paid to other salespeople and he could not find any references to CEDUC.

174.  In reference to the outstanding expenses, on October 19, 2017, Defendant Wagner responded further, stating that Mr. Biewald's employment with Defendant SEP Corp. was terminated on August 30, 2017 and that Mr. Biewald should address this issue with Mr. Moosreiner.

175.  On October 19, 2017, Defendant Wagner wrote to Mr. Biewald, stating, "Any further communication should be directed, as well, to SEP AG."  In another email that same day, Defendant Wagner stated, "Your discussion concerning your continued employment with SEP should continue with [Mr. Moosreiner] per your agreement with [Mr. Moosreiner] and [Mr. Ruoff], as well."

176.  On October 19, 2017, Defendant Wagner emailed Mr. Biewald requesting that he "excuse" his last three emails and confirming that the business expenses due of $1,532.53 were transferred to Mr. Biewald's account on that day, even including an alleged confirmation of the transfer.

177.  On October 23, 2017, Mr. Biewald notified Defendant Wagner, Mr. Moosreiner, and Mr. Ruoff that the alleged money transfer had not been completed.

178.  Defendant Wagner sent the wire transfer for expenses on October 23, 2017.

179.  Mr. Biewald notified Defendants that he inadvertently miscalculated his expenses and he was owed an additional $373.85.

180.  On October 24, 2017, Mr. Moosreiner told Mr. Biewald to enjoy his vacation.

181.  Defendant Wagner authorized an additional transfer in the amount of $373.85 on October 25, 2017.

182.  Mr. Biewald emailed Defendant Wagner that afternoon confirming the receipt of the transfer and Defendant Wagner responded, "I wish you would spend your time on closing business and not writing pointless emails. I got the confirmation of the transfer and sent it to you. That should suffice. We all know that, without questions, if you didn't receive the funds you would announce it with another overly wordy communication. Focus on your job, for all our sakes, please!"

183.  On October 25, 2017, Mr. Biewald twice reminded Mr. Moosreiner to provide feedback on the "Draft 01" of the new employment contract sent on October 17. 2017.

184.  On October 27, 2017, Mr. Biewald sent Defendant Wagner and Mr. Moosreiner an updated summary of all vacation days taken to date, including in October 2017.

185.  On October 27, 2017, Mr. Biewald reminded Mr. Moosreiner that he was still waiting for feedback on "Draft 01" of the new employment contract. Mr. Biewald also reminded Mr. Moosreiner that there are open, unaddressed issued outstanding from the Agreement, including late payments of salary, late reimbursements of expenses, and unpaid commissions.

186.  On October 30, 2017, Mr. Biewald offered to dedicate a large block of time to work on the "Draft 01" of the employment agreement together with Mr. Moosreiner. Mr. Moosreiner did not accept the invitation.

187.  On October 30, 2017, Mr. Biewald again wrote to Defendant Wagner and requested his owed commissions and an accounting of the Sales made, while providing an example of a document from JCNASSUR for CEDUC, where commissions to Mr. Biewald would clearly be due according to the Agreement.

188.  On October 30, 2017, after a deeper review of legal and tax information shared by Mr. Biewald about the proper hiring and payment of employees in the United States, Mr. Moosreiner confirmed to Mr. Biewald that he would continue to be paid, as in the past.

189.  On October 31, 2017, Mr. Biewald received payment for his salary for the second half (1/2) of October 2017.

**Mr. Biewald Worked in November 2017 and Was Not Properly Paid**

190.  On November 14, 2017, due to the lack of response from Mr. Moosreiner, and at the request of Mr. Ruoff, Mr. Biewald sent to Defendant Wagner and to Mr. Moosreiner a "Draft 02" of the new employment contract.  Mr. Biewald received no response.

191.  Additionally, on November 14, 2017, Mr. Biewald again requested payment for his owed commissions and submitted his expense report for $499.24 in expenses incurred from

October 12, 2017 to November 13, 2017, which included activities endorsed by Defendant Wagner.

192.  On November 15, 2017, Mr. Biewald again did not receive payment for his owed salary for the first half (1/2) of November 2017.

193.  On November 15, 2017, Mr. Moosreiner wrote to Mr. Biewald via Skype, assuring Mr. Biewald that he will speak to Defendant Wagner about the missing salary.  Mr. Moosreiner explained that Defendant Wagner was very angry about the costs from Mr. Biewald.

194.  Mr. Biewald responded, indicating that it was his understanding from October 30, 2017 that Defendant Wagner does not bear any costs if he is, in fact, reducing his debts with these costs. Mr. Biewald further explained to Mr. Moosreiner that Defendant Wagner is indeed finding his hard work to be really good because Defendant Wagner enjoys participating in all of Mr. Biewald's latest meetings with Dell EMC.

195.  Mr. Biewald informed Mr. Moosreiner of a major, strategic win with Fujitsu USA which will soon close as a Sale to Federal Mogul via Fujitsu USA.

196.  On November 16, 2017, Defendant Wagner responded to yet another escalation from Mr. Biewald about missing salary, indicating that he deposited half of the funds due ($2,500.00) into Mr. Biewald's bank account and would deposit the balance the next day.

197.  However, as of November 22, 2017, after completing a second transaction, Defendant SEP Corp. had deposited a total of $5,000.00 gross, without withholdings, into Mr. Biewald's bank account.

198.  Mr. Biewald contacted Defendant Wagner about the incorrect payment on November 22, 2017.

33

199.  Defendant Wagner responded that the Agreement ended on April 30th, and that Mr. Biewald was terminated as of August 30, 2017, so he was now a "contractor," and that he was responsible for his own tax filings on monies earned, not his former employer.

200.  Defendant Wagner also transferred an additional $382.50 as an alleged "remainder of your [Mr. Biewald's] contract rate, based on your [Mr. Biewald's] former contract with SEP Corp."

201.  However, Defendant Wagner did not address why Mr. Biewald was paid by Defendant SEP Corp. on a W-2 basis in September and October 2017.

202.  Defendant Wagner further wrote to Mr. Biewald, "You are not entitled to a 'salary' because you no longer have an employment agreement with SEP Corp.  Your continued failure to negotiate a new agreement, per your contract, has drug on for 11 ½ months.  The original end date from you[r] now invalid contract was 30 April – as you so well know."

203.  Defendant Wagner indicated that all further correspondence regarding these matters should be directed to Defendant SEP AG.

204.  On November 24, November 25, and November 27, 2017, Mr. Biewald contacted Defendant Wagner via email and text message asking what the $382.50 represented; Defendant Wagner failed to respond.

205.  On November 25, 2017, Mr. Biewald requested an update on his $449.24 in owed expenses for the expense report submitted on November 14, 2017, which included the activities endorsed by Defendant Wagner.

206.  Defendant Wagner responded on November 27, 2017, suggesting that Mr. Biewald's expenses were unauthorized, without providing any basis therefore, and further

indicating that Mr. Biewald should direct his communications regarding such expenses to Defendant SEP AG.

207.  Mr. Biewald re-submitted his request for the business expenses in writing that afternoon to both Defendant Wagner and Mr. Moosreiner.

208.  On November 27, 2017, Defendant Wagner responded that Mr. Biewald was continually exploiting his friends at SEP, that Mr. Biewald worked for Defendant SEP Corp. until August 30, 2017, that Mr. Biewald's employment contract was cancelled, that Mr. Biewald had no contract in the U.S., and that he would pay the "unwarranted" and "unethical" business expenses only if directed to do so by Defendant SEP AG.

209.  That afternoon, Mr. Biewald again requested a payment of $499.24 from Defendant SEP Corp. for his owed business expenses. Defendant Wagner indicated he requested orders to make the payment.

210.  Mr. Biewald also emailed Defendant Wagner, Mr. Moosreiner, Mr. Ruoff, Mrs. Susanne Moosreiner, and Mr. Sebastian Moosreiner indicating that withholding taxes and standard deductions from his W-2 payroll was required by law and he requested that Defendants take corrective action immediately.

211.  On November 29, 2017, Mr. Biewald reminded Defendant Wagner that the reimbursements were governed by the Agreement which was still in place and it was unfair to not pay him for these expenses.

212.  Defendant Wagner responded, "Unfair? I would say promising all of us at SEP to meet a sales goal of simply exceeding your expenses in 6 months and not performing or even attempting to perform as unethical, then continuing to take a pay check for over 26 ½ months

and running up your costs plus expenses to over $300,000.00 without bringing in one penny of

revenue as grossly unfair. But I guess I was raised differently. In the Midwest we call this

'freeloading.' We at SEP have been men of our word. We wish we could say the same about

you."

213.  Defendant Wagner continued, "Have you no pride? There exist very few people

who, like our current president, can look at complete failure and call it success."

214.  Additionally, Defendant Wagner again continued to state that Mr. Biewald was now

a "contractor" for Defendants and must report any monies earned on a 1040 Tax Statement.

215.  Further, Defendant Wagner stated, "At SEP AG's request I am sending a final

payment through ADP and double withholding your income tax per your request to match the

amount you should have paid to IRS from your 15 November contract payment. The 30

November payment is the final payment for your 2017 vacation pay – although looking at your

results from your former SEP employment it seems like you have been on permanent vacation."

216.  Finally, Defendant Wagner stated that he will send the "last payment for [Mr.

Biewald's] unauthorized expenses."

217.  On November 29. 2017, Mr. Biewald wrote to Defendant Wagner and to the

Officers and Directors of both corporate Defendants, "If you haven't done so already, please

immediately notify ADP Payroll about any and all recent, manual, gross (UNTAXED) salary,

commission, vacation, and/or other taxable-compensation- or taxable-benefit- payment(s) made

by SEP into my bank account during November 2017 so that ADP can immediately correct

and/or "gross-up" any potential issues involving the failure to withhold taxes and standard

deductions."

218.  On November 30, 2017, Mr. Biewald was issued a paycheck on a W-2 basis from Defendant SEP Corp. for $5,000.00 with an additional $1,368.74 withheld in federal taxes.

219.  However, despite the withholding of yet an additional amount of $382.50, Defendant SEP Corp. and Defendant Wagner failed to properly categorize this as Social Security or Medicare payments from the paycheck, rather, just categorizing the extra amount as a "Miscellaneous" withholding, according to the payroll paystub.

220.  The ADP payroll paystub from November 30, 2017 further indicated that the $5000.00 gross amount paid to Mr. Biewald was "regular" pay for the period worked, November 16, 2017 through November 30, 2017.  It was not labeled "vacation" as Defendant Wagner said.

221.  That same day, Mr. Biewald requested his other electronic paystubs from June to November 2017.

222.  Defendant Wagner responded to the reasonable request stating that Mr. Biewald should have requested his paystubs earlier; but still provided the same.

223.  On November 30, 2017, on the subject of vacation days, and for the accuracy of the Defendants' HR records and the proper tracking of Mr. Biewald's employee benefits and earned wages, Mr. Biewald once again provided Defendant Wagner and Mr. Moosreiner with a cumulative list of all vacation days taken.  Defendant Wagner responded, stating, "please desist in sending any further emails relating to your former employment with [Defendant SEP Corp.]. You need to work through, at long last, your possible re-employment with [Defendant SEP AG] as soon as possible and stop dragging your feet and blaming others for your failure to have negotiated a contract by now.  [Defendant SEP AG] has been paying you for the past 3 months without a contract. Your final check covered your last vacation pay.  This is beside the fact that

37

you can't show anyone that you were actually working 30 hours per week for the 26 ½ months you were employed by [Defendant SEP Corp.]."

224.   Mr. Biewald responded to Defendant Wagner: "The (legally-required) Payroll Paystub you provided to me (see attachment) CLEARLY states that I was paid "REGULAR EARNINGS" of $5000 (that is, my earned hourly wages as a salaried SEP employee) - for the Payroll Period starting 16.Nov.2017 and ending 30.Nov. 2017 (i.e., for my last two weeks of work at SEP). Thank you for making this payment of my REGULAR EARNED WAGES (i.e., my SALARY) - a payment that was LEGALLY REQUIRED UNDER THE COLORADO WAGE ACT AND THE UNITED STATES DEPARTMENT OF LABOR LAWS. Tim, this is CLEARLY not any bogus "vacation pay" - as you (wrongly) stated below."

225.   Mr. Biewald further wrote to Defendant Wagner: "The Payroll Paystub also CLEARLY shows that you have heavily taxed - BUT (ONCE AGAIN) ILLEGALLY NOT REPORTED - my earned hourly wages as a salaried SEP employee (that is, for the previous $5000 paid to me in the middle of November)! (You see, after 11 months of work multiplied by $10K salary, my "Year-to-Date Earnings" shown on this Payroll Paystub MUST now show $110K, not just $105K). Tim, YOU ARE NOT PROPERLY REPORTING $5000 IN MY YEAR-TO-DATE EARNINGS to the Colorado State, the United States Government/Internal Revenue Service (IRS, or, "Finanzamt")."

226.   On November 30, 2017, Mr. Ruoff wrote to Mr. Biewald on Skype and inquired about any confusion and missing monies from Defendant Wagner.

227.   Mr. Biewald responded that a $5000.00 salary was indeed paid on November 15, 2017, and, a $5000.00 salary was indeed also paid on November 30, 2017.  However, Defendant

Wagner just did not report the $5000.00 from November 15th to the tax authorities, so SEP therefore did not pay Social Security and other taxes. Mr. Biewald further explained to Mr. Ruoff that Defendant Wagner cannot do that because it is tax evasion. Mr. Biewald told Mr. Ruoff that Defendant Wagner must immediately inform ADP that he had paid Mr. Biewald the $5000.00 as salary on November 15th.

228.  Mr. Ruoff assured Mr. Biewald in the same Skype message that Defendant Wagner will take the course of action that Mr. Biewald had suggested.

229.  Defendant Wagner said that a 1099 would be issued for the $5,000.00 paid on November 15th for the pay period of November 1 through November 15, 2017, but that the $5,000.00 paid on November 30th for the pay period of November 15 through November 30, 2017, would be paid on a W-2 basis as "payroll."

**Mr. Biewald Worked in December 2017 and Was Not Properly Paid**

230.  On December 1, 2017, Mr. Biewald provided Defendant Wagner, Mr. Moosreiner, and Mr. Ruoff with "Draft 03" of a new employment agreement.  Only Mr. Ruoff responded to Mr. Biewald, saying, "We already have a NEW contract for you.  So don't be worried about your changes.  [Mr. Moosreiner] will send it to you latest tomorrow."

231.  On December 1, 2017, Defendant Wagner claimed in an email to Mr. Biewald that one of the $5,000 amounts paid to Mr. Biewald in November 2017 was going to be reported on a 1099, while the other $5,000 amount paid to Mr. Biewald in that same month was confirmed by Mr. Moosreiner and Mr. Ruoff to be payroll/salary for Mr. Biewald.

232.  Mr. Biewald responded, indicating to Defendant Wagner that he is cheating the government because the corporate Defendants would benefit by not paying the required payroll

taxes and other financial obligations to Colorado State and the IRS.  The Officers and Directors of both corporate Defendants were placed on copy.

233.  On December 4, 2017, Mr. Biewald notified Defendant Wagner, Mr. Moosreiner, and Mr. Ruoff that his payment on November 15th needed to be properly reported as a W-2 transaction and requested an accounting of commissions as required by the Agreement in order to address the still-outstanding commissions due to Mr. Biewald.

234.  Mr. Ruoff responded to Mr. Biewald and Defendant Wagner stating that he never wants to read such a shit email from them again, and he directed Defendant Wagner and Mr. Biewald to call Mr. Moosreiner that afternoon to clear up the outstanding issues.  He also requested that Mr. Moosreiner, who was on copy, should review Mr. Biewald's new contract with Mr. Sebastian Moosreiner and then send it out that same night.  Mr. Ruoff further stated that he will no longer do any activities in the USA until the contract is signed.

235.  On December 11, 2017, Mr. Biewald requested that Defendants "gross-up" the missing Social Security and Medicare taxes from the November salary payment during the mid-month payroll processing.

236.  On December 13, 2017, Mr. Biewald emailed Arrone Appel (CPA for the corporate Defendants) regarding the missing reporting of earned wages.

237.  Mr. Biewald also emailed Defendant Wagner, Mr. Moosreiner, Mr. Ruoff, and Mr. Sebastian Moosreiner on that day, as well as December 14, 2017, again requesting that his earnings be listed as wages and the taxes be properly withheld from the same.

238.  On December 14, 2017, Mr. Biewald submitted his expense report for expenses from November 14, 2017, through December 13, 2017, totaling $416.19, with reimbursement due on December 29, 2017.

239.  Mr. Biewald also sent a work update to Defendant Wagner on December 14, 2017.

240.  Defendant Wagner responded, "are you trying to be insulting or are you just clueless? We have been waiting here in the US for an AWS/S3 connector for over 4 years. To ask if Jim is interested is unfathomable - unerhört. It is extremely upsetting that you seem to be taking most of the credit for this effort, when you refer to the collective 'we'. Let me thank you for taking a few minutes of your time after 26 1/2 months of employment and 3 months for SEP AG to get involved with one of our technical/marketing white papers. In actual fact all you've done is proof read it and ask for some minor changes. Klaus, Julia and the SEP AG staff and development team have been working on the SES white paper for months along with so many other issues. It seems like you are trying to justify your efforts for it when, in fact, you have done little or nothing to advance the project. But, that is what you do, isn't it? I.e. Nothing. Thanks again for splashing your holy water on the white paper after a long and complicated effort by SEP AG. We here in the US all hope it wasn't too much trouble to do some actual work for SEP and we, again, thank you for your small, yet insignificant effort."

241.  On December 15, 2017, Defendant Wagner stated that he was directed to continue paying Mr. Biewald's medical insurance, paid Mr. Biewald's salary on December 15, 2017, added the $5,000.00 from the early November payment to Mr. Biewald's earned wages, withheld the Social Security/Medicare taxes from the early November payment, and sent him an email with instructions on how to access his paystubs moving forward.

242.  However, Defendant Wagner still stated that Mr. Biewald was an "SEP AG contractor."

243.  On December 26, December 27, and December 28, 2017, Mr. Biewald restated his request for clarification on the reason for the $382.50 payment, offering to apply it to his owed expenses.

244.  Defendant Wagner responded that any further communication from Mr. Biewald "will be ignored."

245.  However, on December 28, 2017, Defendant Wagner transferred $33.69 (the $416.19 in business expenses owed minus the $382.50) into Mr. Biewald's bank account.

**Mr. Biewald Worked in January 2018 and Was Not Properly Paid**

246.  On January 4, 2018, Defendant Wagner stated that Mr. Biewald was "terminated, without cause, per Colorado law, on 30 August 2017." Defendant Wagner continued that Defendant SEP AG directed him to make payments until the end of December as a "contractor for Germany."

247.  On January 10, 2018, Mr. Biewald submitted his expense report from December 14, 2017 through January 05, 2018, for $247.10.

248.  Mr. Biewald requested payment for his expenses on January 19, January 23, January 24, and January 25, 2018.

249.  On January 26, 2018, Mr. Moosreiner responded that he had directed Defendant Wagner to pay the expenses.

250.  On January 31, 2018, Mr. Biewald notified Defendant Wagner, Mr. Moosreiner, Mr. Ruoff, Mrs. Susanne Moosreiner, and Mr. Sebastian Moosreiner that his expenses had not yet been paid.

251.  Mr. Biewald did not receive his salary payment on January 12 or January 31, 2018.

252.  Mr. Biewald notified the company of his missing salary on January 16, 2018.

253.  Mr. Moosreiner responded on January 17, 2018, that he had given Defendant Wagner a mandate to pay Mr. Biewald's earned income. Mr. Moosreiner further stated that Defendant Wagner rejects any working-cooperation with Mr. Biewald.

254.  Mr. Biewald restated his request for salary on January 19, January 23, January 24, and January 31, 2018.

255.  On January 31, 2018, Mr. Moosreiner stated that Defendant Wagner does not want to transfer money to Mr. Biewald anymore, according to Defendant Wagner's lawyer. Mr. Moosreiner promised to talk to Mrs. Susanne Moosreiner the following day, so that they can transfer Mr. Biewald a payment of $5000.00 or $10,000.00.

**Mr. Biewald Worked in February 2018 and Was Not Properly Paid**

256.  On February 6, 2018, Mr. Biewald received a payment in the gross amount of $10,000.00 from Defendant SEP AG, without taxes withheld.

257.  Mr. Biewald requested payment of his expenses on February 6, February 12, and February 14, 2018.

258.  On February 12, 2018, Mr. Biewald requested an update on payment of his outstanding commissions and requested that the $10,000.00 payment be added to his earned wages with necessary payroll withholdings taken from the same.

259. Mr. Biewald forwarded his concerns about his salary to Mr. Arrone Appel on February 14, 2018, noting that Defendants were willfully not paying his employment taxes.

260. On February 15, 2018, Defendant Wagner stated that Mr. Biewald had "absolutely no permission to speak with our CPA in Colorado," but did not address the tax issues.

261. Similarly, on February 15, 2018, Mr. Biewald requested an update on the payment of his $5,000.00 salary for the pay period February 1, 2018 through February 15, 2018 and restated his request that the $10,000.00 payment be added to his earned wages and processed as payroll.

262. On February 13, 2018, Mr. Biewald submitted his expense report totaling $5,912.77 for expenses from January 26, 2018 through February 12, 2018.

263. Mr. Biewald did not receive his salary on February 15, 2018, and as of that date was owed expenses from January 2018 of $247.10, and February 2018 of $5,912.77, totaling $6,159.87.

264. Similarly, on February 15, 2018, Defendant SEP AG presented Mr. Biewald with a proposed independent contractor/freelancer contract which the company requested to retroactively put in place beginning on February 1, 2018.

265. Mr. Moosreiner emailed Mr. Biewald noting that the contract between Mr. Biewald and Defendant SEP Corp. was agreed upon June 8, 2015, but stated that the insane commissions negotiated between Mr. Biewald and Defendant Wagner are the death of SEP AG. Further, Mr. Moosreiner stated that paying 30% commission is business insanity.

266. Although Mr. Moosreiner is a signatory on the Agreement, he attempted to claim that the contract was only between Mr. Biewald and Defendant SEP Corp. *See*, Exhibit No. 1.

267.  Further, Mr. Moosreiner stated that Mr. Biewald's alleged termination communicated by Defendant Wagner was legally correct.

268.  However, Mr. Moosreiner did not discuss payment for Mr. Biewald's commissions, residual commissions, severance, vacation payout, or health insurance State Continuation information contractually and statutorily owed upon termination of the Agreement.

269.  On February 20, 2018, Defendant SEP AG deposited another $5,000.00 gross into Mr. Biewald's bank account.

270.  Similarly, on February 20, 2018, Mr. Biewald was notified by United Healthcare that Defendants had terminated his health care coverage, effective March 1, 2018.

271.  On February 25, 2018, Mr. Biewald notified Defendant Wagner, Mr. Moosreiner, Mr. Ruoff, and Mrs. Susanne Moosreiner that the payment was due on February 15, 2018, and was therefore late, and that taxes were not withheld from the same. Mr. Biewald also requested payment for his unpaid business expenses.

**Mr. Biewald Worked in March 2018, Was Not Properly Paid and Was Terminated**

272.  Mr. Biewald did not receive his $5,000.00 salary on February 28, 2018.

273.  On March 5, 2018, Mr. Biewald requested payment for his missing salary and correction of his previous salary payment to include taxes.

274.  Mr. Moosreiner responded on March 5, 2018, stating that the Defendants did not have a contractual relationship with Mr. Biewald and that Mr. Biewald should stop working until a new contract was signed.

275.  Similarly, on March 5, 2018, Mr. Biewald was not connected to the Team Conference Call and his company email was turned off.

276.  Pursuant to the Agreement, Mr. Biewald was entitled to a thirty (30) day notice, thereby making his last day April 4, 2018, or thirty (30) days after Mr. Moosreiner's notice on March 5, 2018.

277.  Mr. Moosreiner did not address or pay Mr. Biewald's final paycheck, any severance monies, earned commissions, expense reimbursements, residual commissions, health insurance State Continuation, or payment for earned vacation days upon sending the alleged written notice of termination or at the alleged termination date.

278.  On March 6, 2018, Mr. Biewald received payment for his January 2018 expenses totaling $247.10.

279.  On March 7, 2018, Mr. Moosreiner emailed Mr. Biewald stating that Mr. Biewald's requests for his unpaid wages were blocking business operations. Mr. Moosreiner continued saying that he had blocked Mr. Biewald's email address from all of Defendants' employees except for himself, Mr. Ruoff, and Mrs. Susanne Moosreiner.

280.  On March 9, 2018, our office transmitted a Formal Demand for Payment to Defendants requesting payment of Mr. Biewald's earned vacation, payment of his earned commissions, as well as an auditing of the same, payment of severance, payment of his missing salary, and payment of his outstanding business expenses, payment of residual commissions, and payment of all outstanding tax obligations on salary earned.

281.  Defendants were notified therein that failure to pay earned wages within fourteen (14) days thereafter would be treated as a tender of no money under the CWCA. *See*, Colo. Rev. Stat. § 8-4-110(1).

282.  On March 12, 2018, Mr. Moosriener responded to Mr. Biewald directly, noting that the proposed freelancer contract was revoked and that no further contact with Mr. Biewald will be allowed at Defendant SEP AG until Mr. Biewald's situation with Defendant SEP Corp. is settled."

283.  On March 13, 2018, Dr. Marcel Grobys, Mr. Biewald's attorney in Germany sent a demand letter to Defendant SEP AG requesting payment for wages owed and a confirmation of termination, as well as all contractually required items due upon termination of the Agreement.

284.  Mr. Moosreiner responded, demanding that all requests go through Defendant Wagner and Defendant SEP Corp.

285.  On March 16, 2018, Defendant Wagner responded to Dr. Grobys stating that Mr. Biewald was terminated from Defendant SEP Corp. on July 31, 2017, with an effective date of August 30, 2017. Defendant Wagner stated that Mr. Biewald could not attend any more business functions as an agent of Defendant SEP Corp. or he would be subject to "prosecution under the laws of the United States for potential fraud and false impersonation."

286.  On April 30, 2018, Mr. Biewald received his 2017 W-2 indicating that he earned $120,000.00 (his full salary under the Agreement) from Defendant SEP Corp. on a W-2 basis in 2017. All payroll taxes and withholdings had been properly deducted and/or corrected.

287.  In sum, according to the Defendants, Mr. Biewald was allegedly terminated from Defendant SEP Corp. on August 30, 2017. However, he was paid salary and reimbursed expenses from Defendant SEP Corp. through December 31, 2017. Additionally, Mr. Biewald received an expense reimbursement, in addition to untaxed salary payments from Defendant SEP AG through February 15, 2018, and health coverage continued until February 28, 2018 - later

extended to April 30, 2018 in order to comply with State Continuation. Further, Mr. Biewald

continued his employment uninterrupted (but without payment) through the notice period, with

notice issued on March 5, 2018, and an effective date of April 4, 2018. After the termination, the

corporate Defendants failed to pay Mr. Biewald's salary, commissions, residual commissions,

vacation pay, severance, and expenses, as required by the Agreement, state, and/or federal law.

## FIRST CLAIM FOR RELIEF
*(Violations of the CWCA - Salary - Against the Corporate Defendants)*

288.  Plaintiff incorporates by reference paragraphs 1 through 287 as if fully set forth

herein.

289.  Mr. Biewald performed work for the corporate Defendants as an "employee," as

that term is set forth in Colo. Rev. Stat. 8-4-101(4).

290.  Plaintiff was employed with Defendant SEP Corp. and Defendant SEP AG from

June 8, 2015 until April 4, 2018.

291.  The corporate Defendants agreed to pay Mr. Biewald a base salary of $120,000.00

per year, which is a rate of $454.54 per day. *See,* Exhibit No. 1, Section 2(a).

292.  Defendant SEP Corp. and Defendant SEP AG failed to pay Plaintiff his earned

wages for thirty-three (33) working days, from February 15, 2018 through April 4, 2018.

293.  The corporate Defendants intentionally withheld Plaintiff's rightfully earned wages.

294.  An employer is liable under the CWCA if the employer does not pay an employee

wages he has earned immediately when they are due and payable or immediately at the time of

termination. *Lee v. Great Empire Broad., Inc.*, 794 P.2d 1032, 1034 (Colo. App. 1989); *see also,*

Colo. Rev. Stat. § 8-4-109(1).

295.  Upon the termination of his employment with Defendant SEP Corp. and Defendant SEP AG, Plaintiff was owed earned, accrued wages, totaling $14,999.82.

296.  Plaintiff transmitted a Formal Demand for Wages on March 9, 2018.

297.  The corporate Defendants failed to pay after receiving the demand letter.

298.  Pursuant to the provisions of the CWCA, Plaintiff is now entitled to a penalty of one hundred twenty-five percent (125%) of the wages up to $7,500.00 ($7,500.00 * 125% or $9,375.00) and fifty percent (50%) of the wages above $7,500.00 ($7,499.82 * 50% or $3,749.91), totaling $6,562.45 in penalties) or $28,124.73 ($14,999.82 + $9,375.00 + $3,749.91) in wages and penalties due. *See,* Colo. Rev. Stat. § 8-4-109(3)(b).

299.  Upon information and belief, the corporate Defendants' failure to pay is willful.

300.  As the failure to pay is willful, Plaintiff is entitled to increased penalties by fifty percent (50%) ($6,562.45 * 50% or $3,281.23 in additional penalties), totaling **$31,405.95** ($14,999.82 + $9,375.00 + $3,749.91 + $3,281.23) in vacation hours and penalties due, not including interest. *See,* Colo. Rev. Stat. § 8-4-109(3)(c).

301.  Furthermore, Plaintiff requests all applicable sanctions, penalties, and attorney fees against Defendant SEP Corp. and Defendant SEP AG for the violation of the CWCA. *See,* Colo. Rev. Stat. § 8-4-110(1).

302.  As a direct, proximate, and foreseeable result of the corporate Defendants' actions, Plaintiff has suffered damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**

*(Violations of the CWCA - Commissions - Against the Corporate Defendants)*

303. Plaintiff incorporates by reference paragraphs 1 through 302 as if fully set forth herein.

304. Mr. Biewald performed work for the corporate Defendants as an "employee," as that term is set forth in Colo. Rev. Stat. 8-4-101(4).

305. Plaintiff was employed with Defendant SEP Corp. and Defendant SEP AG from June 8, 2015 until April 4, 2018.

306. The corporate Defendants agreed to pay Mr. Biewald a commission of thirty percent (30%) of the purchase order or order value of any "Sale." *See,* Exhibit No. 1, Section 2(b).

307. Defendant SEP Corp. and Defendant SEP AG also agreed to pay "Residual Commissions" on all Sales occurring within a six (6) month period after the effective date of the termination, as the Parties agreed those monies were previously earned. *See,* Exhibit No. 1, Section 5(c).

308. The corporate Defendants failed to pay Plaintiff his earned commissions during his employment.

309. Defendant SEP Corp. and Defendant SEP AG intentionally withheld Plaintiff's rightfully earned wages.

310. An employer is liable under the CWCA if the employer does not pay an employee wages he has earned immediately when they are due and payable or immediately at the time of termination. *Lee v. Great Empire Broad., Inc.*, 794 P.2d 1032, 1034 (Colo. App. 1989); *see also,* Colo. Rev. Stat. § 8-4-109(1).

311.  Pursuant to the version of the CWCA applicable here, wages or compensation also include commissions earned in accordance with the terms of any agreement. *See,* Colo. Rev. Stat. § 8-4-101(8).

312.  Upon the termination of his employment with the corporate Defendants, Plaintiff was owed earned, accrued commissions, totaling at least $7,111.26.

313.  Plaintiff is also entitled to an auditing and residual commissions until October 2018.

314.  Plaintiff transmitted a Formal Demand for Wages on March 9, 2018.

315.  Defendant SEP Corp. and Defendant SEP AG failed to pay Plaintiff's commissions after receiving the demand letter.

316.  Pursuant to the provisions of the CWCA, Plaintiff is now entitled to a penalty of one hundred twenty-five percent (125%) of the wages up to $7,500.00 ($7,111.26 * 125% or $8,889.07) or $16,000.33 ($7,111.26 + $8,889.07) in wages and penalties due. *See,* Colo. Rev. Stat. § 8-4-109(3)(b).

317.  Upon information and belief, the corporate Defendants' failure to pay is willful.

318.  As the failure to pay is willful, Plaintiff is entitled to increased penalties by fifty percent (50%) ($8,889.07 * 50% or $4,444.53 in additional penalties), totaling **$27,556.12** ($7,111.26 + $16,000.33 + $4,444.53) in commissions and penalties due, not including interest. *See,* Colo. Rev. Stat. § 8-4-109(3)(c).

319.  Furthermore, Plaintiff requests all applicable sanctions, penalties, and attorney fees against Defendant SEP Corp. and Defendant SEP AG for the violation of the CWCA. *See,* Colo. Rev. Stat. § 8-4-110(1).

320.  As a direct, proximate, and foreseeable result of the corporate Defendants' actions, Plaintiff has suffered damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
*(Violations of the CWCA - Vacation Pay - Against the Corporate Defendants)*

321.  Plaintiff incorporates by reference paragraphs 1 through 320 as if fully set forth herein.

322.  Plaintiff performed work for the corporate Defendants as an "employee," as that term is set forth in Colo. Rev. Stat. 8-4-101(4).

323.  Plaintiff earned twenty (20) vacation days per year of employment which carried over from year to year. *See,* Exhibit No. 1, Section 3.

324.  Plaintiff was employed with Defendant SEP Corp. and Defendant SEP AG in 2015, 2016, 2017, and 2018, earning a total of eighty (80) vacation days.

325.  During his employment, Mr. Biewald used thirty-five (35) vacation days, for a remainder of forty-five (45) days.

326.  Defendant SEP Corp. and Defendant SEP AG intentionally withheld Plaintiff's rightfully earned vacation pay for forty-five (45) vacation days.

327.  An employer is liable under the CWCA if the employer does not pay an employee wages he has earned immediately when they are due and payable or immediately at the time of termination. *Lee v. Great Empire Broad., Inc.*, 794 P.2d 1032, 1034 (Colo. App. 1989); *see also,* Colo. Rev. Stat. § 8-4-109(1).

328.  Vacation hours are "items of value" promised in exchange for Mr. Biewald's services and are, therefore, compensation. *See generally, Thompson v. Cheyenne Mountain Sch. Dist. No. 12*, 844 P.2d 1235, 1236 (Colo. App. 1992).

329.   Similarly, the definition of "wages" includes vacation pay provided for in an employment contract. *See*, *Hartman v. Freedman*, 591 P.2d 1318, 1322 (1979).

330.   Upon the termination of his employment with the corporate Defendants, Plaintiff was owed earned, accrued vacation hours, totaling $20,454.30.

331.   Plaintiff transmitted a Formal Demand for Wages on March 9, 2018.

332.   Defendant SEP Corp. and Defendant SEP AG failed to pay the owed monies after receiving the same.

333.   Pursuant to the provisions of the CWCA, Plaintiff is now entitled to a penalty of one hundred twenty-five percent (125%) of the wages up to $7,500.00 ($7,500.00 * 125% or $9,375.00) and fifty percent (50%) of the wages above $7,500.00 ($12,954.30 * 50% or $6,477.15), totaling $15,852.15 in penalties) or $36,306.45 in wages and penalties due. *See,* Colo. Rev. Stat. § 8-4-109(3)(b).

334.   Upon information and belief, the corporate Defendants' failure to pay is willful.

335.   As the failure to pay is willful, Plaintiff is entitled to increased penalties by fifty percent (50%) ($15,852.15 * 50% or $7,926.07 in additional penalties), totaling **$44,232.52** in vacation hours and penalties due, not including interest. *See,* Colo. Rev. Stat. § 8-4-109(3)(c).

336.   Furthermore, Plaintiff wishes to impose all applicable sanctions, penalties, and attorney fees against Defendant SEP Corp. and Defendant SEP AG for its violation of the CWCA. *See,* Colo. Rev. Stat. § 8-4-110(1).

337.   As a direct, proximate, and foreseeable result of the corporate Defendants' actions, Plaintiff has suffered damages in an amount to be proven at trial.

## **FOURTH CLAIM FOR RELIEF**
### *(Breach of Contract- Against the Corporate Defendants)*

338.  Plaintiff incorporates by reference paragraphs 1 through 337 as if set forth in full herein.

339.  The Parties entered into an Agreement whereby the Company agreed to pay Plaintiff salary, commissions, and reimburse expenses.

340.  In addition, upon termination of the Agreement, the corporate Defendants agreed to pay Plaintiff six (6) months of severance at his current base salary, residual commission for six (6) months, and all earned but unused vacation hours.

341.  Upon the termination of his employment, Plaintiff was owed:

      a)        Earned, accrued wages, totaling $14,999.82;

      b)        Earned, accrued commissions, totaling at least $7,111.26;

      c)        Expense reimbursements, totaling at least $9,594.49;

      d)        Six (6) months' severance, totaling $60,000.00;

      e)        Earned, accrued vacation hours, totaling $20,454.30; and,

      f)        Residual commissions until October 2018.

342.  Plaintiff performed his part of the Agreement by satisfactorily performing work in his position.

343.  Defendant SEP Corp. and Defendant SEP AG breached the Parties' Agreement by failing to pay Plaintiff his rightfully earned salary, commissions, and reimburse his expenses which breach(es) resulted in damages to Plaintiff in an amount to be determined at trial.

344.  Similarly, the corporate Defendants breached the Parties' Agreement by failing to pay Plaintiff his rightfully earned severance, residual commissions, and unused vacation hours which breach(es) resulted in damages to Plaintiff in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
*(Unjust Enrichment- Against the Corporate Defendants)*

345.  Plaintiff incorporates Paragraphs 1 through 344 as if fully set forth herein.

346.  By having not paid salary, commissions, expense reimbursements, severance, vacation hours, and residual commissions rightfully owed to Plaintiff, the corporate Defendants have received benefits under the circumstances which would make it unjust for them to retain such benefits without payment to Plaintiff.

347.  Equity and justice dictate that Defendant SEP Corp. and Defendant SEP AG not be permitted to retain monies rightfully owed to Plaintiff.

348.  As a direct and proximate result of the corporate Defendants' actions, Plaintiff has been damaged in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
*(Conversion – Against the corporate Defendants)*

349.  Plaintiff incorporates by reference Paragraphs 1 through 348 as if set forth in full herein.

350.  Defendant SEP Corp. and Defendant SEP AG wrongfully appropriated and wrongfully exercised permanent dominion and control over monies that are rightfully belonging to Plaintiff.

351.  Plaintiff is entitled to immediate ownership, possession, and control of the tangible personal property wrongfully converted by the corporate Defendants.

352.  Defendant SEP Corp. and Defendant SEP AG's exercise of dominion and control over the monies unjustifiably denied Plaintiff's right to use, exploit, and profit from such monies.

353.  The exercise of dominion and control over the monies of Plaintiff by the corporate Defendants is without legal justification and constitutes conversion of Plaintiff's property.

354.  The wrongful conversion of Plaintiff's personal property was accomplished by the corporate Defendants under circumstances of fraud, willful and wanton misconduct, and/or recklessness within the meaning of Colo. Rev. Stat. § 13-21-102.

355.  As a direct and foreseeable result of Defendant SEP Corp. and Defendant SEP AG's actions, the Plaintiff has suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
*(Promissory Estoppel – Against the Corporate Defendants)*

356.  Plaintiff incorporates by reference paragraphs 1 through 355 as if fully set forth herein.

357.  Through its action and words, the corporate Defendants made representations that it reasonably knew, or should have known, would cause the Plaintiff to believe the Company made enforceable promises to provide progressive discipline, follow state, local and federal laws and pay Plaintiff his wages made and hours worked.

358.  Plaintiff acted in reasonable reliance on the Defendant SEP Corp. and Defendant SEP AG's statements or actions.

359.  Injustice can only be avoided by enforcing the implied contract or promises.

360.  As a direct result of the corporate Defendants' actions, Plaintiff has incurred damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
*(Violations of the FLSA-Against all Defendants)*

361.   Plaintiff incorporates by reference paragraphs 1 through 360 as if fully set forth herein.

362.   Defendants were, and are, subject to the recordkeeping and overtime pay requirements of the FLSA because they are an enterprise engaged in commerce and their employees are engaged in commerce.

363.   Defendant Wagner had supervisory authority over Mr. Biewald and is personally liable as an employer under the FLSA. *See*, 29 U.S.C. § 203(a).

364.   Section 13 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations.

365.   To qualify for an exemption, an employee must be paid not less than $455 per week on a salary basis, meaning that the employee regularly receives a predetermined amount of compensation each pay period on a weekly, or less frequent, basis. The predetermined amount cannot be reduced because of variations in the quality or quantity of the employee's work.

366.   Reductions in the predetermined salary of an employee who is exempt will cause a loss of the exemption.

367.   If the exemption is lost, an employee must be paid the minimum wage and overtime required by the FLSA.

368.   Employers must pay for all time worked.

369.   Work not necessarily requested but suffered or permitted is compensable. *See*, 29 C.F.R. § 785.17.

370.  Defendants' refusal to pay Plaintiff's salary resulted in a loss of the salary basis exemption and Plaintiff received less than minimum wage for his hours worked.

371.  None of the FLSA exemptions apply to Plaintiff. Accordingly, Plaintiff must be paid for all hours worked and for overtime pay in accordance with the FLSA.

372.  Defendants violated the FLSA by failing to pay Plaintiff for all hours worked, including overtime. In the course of perpetrating these unlawful practices, Defendants have also willfully failed to keep accurate records of all hours worked by Plaintiff.

373.  Plaintiff is entitled to damages equal to the unpaid wages and mandated overtime premium pay within the three (3) years preceding the filing of this Complaint, plus periods of equitable and agreed-upon tolling, because Defendants acted willfully and knew, or showed reckless disregard of whether, their conduct was prohibited by the FLSA.

374.  Defendants have not acted in good faith, nor with reasonable grounds to believe their actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiff is entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages and overtime pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants did not act willfully in failing to pay for all hours worked and for overtime wages, Plaintiff is entitled to an award of pre- and post-judgment interest at the applicable legal rate.

375.  As a result of the aforesaid willful violations of the FLSA, pay for all hours worked and overtime compensation have been unlawfully withheld by Defendants from Plaintiff for which Defendants are liable pursuant to 29 U.S.C. § 216(b), together with an additional equal

amount as liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

## NINTH CLAIM FOR RELIEF
*(Violations of the FLSA – Retaliation – Against all Defendants)*

376.   Plaintiff incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

377.   At all times material herein, Plaintiff has been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201 *et seq.*

378.   The FLSA prohibits employers from retaliating against employees who oppose violations of the same.

379.   The FLSA regulates, among other things, payment by employers whose employees are engaged in the alleged activities for the benefit of the Defendant.

380.   Defendants were, and are, subject to the recordkeeping and overtime pay requirements of the FLSA because they are an enterprise engaged in commerce and their employees are engaged in commerce.

381.   Defendants violated the FLSA by refusing to pay Plaintiff would not be paid for all time worked at the request of and for the benefit of Defendants.

382.   Plaintiff made good faith assertions of his statutory rights and objected to the actions of Defendants which violated the FLSA.

383.   As a result of his opposition to the Defendants' violations of the FLSA, Plaintiff was terminated.

384.   Plaintiff is entitled to damages equal to his lost wages.

385.  Defendants have not acted in good faith, nor with reasonable grounds to believe their actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiff is entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages and overtime pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

386.  Alternatively, should the Court find Defendants did not act willfully in failing to pay for all hours worked and for overtime wages, Plaintiff is entitled to an award of pre- and post-judgment interest at the applicable legal rate.

387.  As a result of the aforesaid willful violations of the FLSA anti-retaliation provision, pay for all hours worked and overtime compensation have been unlawfully withheld by Defendants from Plaintiff for which Defendants are liable pursuant to 29 U.S.C. § 216(b), together with an additional equal amount as liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

## TENTH CLAIM FOR RELIEF

*(Violations of the Colorado Minimum Wage Order-Against the Corporate Defendants)*

388.  Plaintiff incorporates by reference paragraphs 1 through 387 as if fully set forth herein.

389.  The corporate Defendants have violated the Wage Order. Colo. Rev. Stat. §§ 8-6-101, *et seq.*

390.  Defendant SEP Corp. and Defendant SEP AG are required under Colorado law to pay Plaintiff for his time worked. *See,* 7 Colo. Code Regs. § 1103.

391.  Because the corporate Defendants have not paid Plaintiff wages for all hours worked and did not pay overtime wages, he has been damaged in an amount to be determined at trial.

392.  In addition to unpaid wages and overtime pay, Plaintiff seeks to recover penalties, attorneys' fees and costs. *See*, Colo. Rev. Stat. §§ 8-6-101 et seq.

393.  As a direct result of the corporate Defendants' actions, the Plaintiff has incurred damages in an amount to be proven at trial.

### ELEVENTH CLAIM FOR RELIEF
*(Wrongful Termination in Violation of Public Policy- Against the Corporate Defendants)*

394.  Plaintiff incorporates by reference paragraphs 1 through 393 as if fully set forth herein.

395.  The corporate Defendants' conduct prohibited the Plaintiff from exercising an important job-related right or privilege, in that Defendants retaliated against Plaintiff by terminating his employment after he questioned its failure to properly provide him with compensation.

396.  After complaining regarding his earned wages, Plaintiff was subsequently and promptly terminated as a result of seeking to exercise his legally protected rights and privileges under the CWCA and Wage Order.

397.  Defendant SEP Corp. and Defendant SEP AG's actions violate the CWCA and Wage Order for failure to properly compensate any employee of rightfully due and owing compensation. In addition, such activities by the Defendants clearly undermine an expressed public policy relating to Plaintiff's basic legal rights or privileges as a worker.

398. A termination in retaliation for protesting violations of the Wage Order supports a claim for wrongful discharge in violation of public policy. *Bonidy v. Vail Valley Center for Aesthetic Dentistry,* 232 P.3d 277, 281 (Colo. App. 2010).

399. Defendants were aware, or reasonably should have been aware, that the Plaintiff's submission of complaints was a protected privilege and/or right under federal and state law(s).

400. As a direct, proximate and foreseeable result of Defendant SEP Corp. and Defendant SEP AG's intentional actions, the Plaintiff has suffered damages in an amount to be proven at trial.

401. As a direct and proximate result of such actions, Plaintiff has suffered and continues to suffer a loss of wages and benefits, a loss of job, loss of career opportunities and interruption of career path, emotional distress, inconvenience, mental anguish, loss of enjoyment of life and other consequential damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a judgment to be entered in his favor and against Defendants, and Order the following relief:

a. Front pay and benefits in lieu of reinstatement;

b. Back pay, benefits, and other economic losses;

c. Compensatory damages, including but not limited to those for emotional distress;

d. Liquidated damages on all claims allowed by law;

e. Statutory penalties and fines on all claims allowed by law;

f. Punitive and exemplary damages as allowed by law;

g. Relevant statutory damages;

    h.   Pre-judgment and post-judgment interest at the highest lawful rate;

    i.   Attorney fees and costs of this action, including expert witness fees, as available by law; and,

    j.   Any such further relief allowable by law or as justice requires.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable in the instant action.

Respectfully submitted on July 31st, 2019.

BRYAN E. KUHN, COUNSELOR AT LAW, P.C.

*Original pleading bearing original signature maintained in the offices of Bryan E. Kuhn, Counselor at Law, P.C.*

s/ *Kate W. Beckman*
Bryan E. Kuhn, Esq. #33642
Kate W. Beckman, Esq. #42416
1660 Lincoln Street, Suite 2330
Denver, Colorado 80264
(p) (303)424-4286 (f) (303)425-4013
Bryan.Kuhn@beklegal.com
Kate.Beckman@beklegal.com
ATTORNEYS FOR PLAINTIFF